IN THE DISTRICT COURT OF GUAM

TERRITORY OF GUAM

\* \* \*

FILED
DISTRICT COURT OF GUAM

SEP 13 2007

JEANNE G. QUINATA
Clerk of Court

| | |
|---|---|
| UNITED STATES OF AMERICA,      ) | COURT OF APPEALS |
|                ) | CASE NO. 07- |
|            Plaintiff,    ) | |
|                ) | |
|      vs.              ) | CASE NO. CR07-00001 |
|                ) | CASE NO. CR07-00025 |
| RYAN JASON WALL,          ) | |
|                ) | |
|           Defendant.    ) | |
| _____) | |

TRANSCRIPT OF PROCEEDINGS

BEFORE

THE HONORABLE FRANCES TYDINGCO-GATEWOOD

Chief Judge

**MOTION TO SUPPRESS**

**THURSDAY, MARCH 15, 2007**
**&**
**MONDAY, MARCH 19, 2007**
**&**
**TUESDAY, MARCH 20, 2007**



Wanda M. Miles
Official Court Reporter
District Court of Guam

1

1    **APPEARANCES:**

2    FOR THE PLAINTIFF:

3    UNITED STATES ATTORNEY
     BY:   ROSETTA SAN NICOLAS, Esq.
4    Assistant United States Attorney
     Suite 500, Sirena Plaza
5    108 Hernan Cortez Avenue
     Hagatna, Guam  96910

6

7

8    FOR THE DEFENDANT:

9    OFFICE OF THE FEDERAL PUBLIC DEFENDER
     BY:   RICHARD P. ARENS, ESQ.
10   Assistant Federal Public Defender
     First Hawaiian Bank Building, Suite 501
11   400 Route 8
     Mongmong, Guam  96910

12

13

14   _____

15

16                     **I N D E X**

17   

| Government Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Marvin R. Desamito | 13 | 37 | | |
| | | 75 (resumed) | | |
| | | 114 (resumed) | | |
| | | | 118 | 125 |
| | | | | 135 |
| | | | 138 | |
| Joseph A. Gange | 139 | 153 | 163 | 170 |
| Michael C. Perkins | 172 | 176 | 185 | 186 |
| | | | | 192 |
| | | | 197 | 199 |

25

                    Wanda M. Miles
                  Official Court Reporter
                  District Court of Guam

```
1                    E X H I B I T S

2

3    Government Exhibits              Indentified/Admitted

4    10 - Desamito's affidavit          18

5    11 - Search Warrant                69

6    12 - Affidavit Application         69/81/128    247

7    13 - X-ray of package              146/147      247

8    14 - X-ray of package             148          247

9    15 - X-ray of package             148          247

10

11

12

13

14   DEFENSE EXHIBITS                 IDENTIFIED/ADMITTED

15   A - Page 32 (Officer Perkins' report)    42

16   B - Officer J. Gange's report            153

17   C - Page 11 (Officer Perkins' report)    180

18

19

20

21

22

23

24

25
```

Wanda M. Miles
Official Court Reporter
District Court of Guam

1   Drug Enforcement Administration task force office?

2       A.   I've been with the DEA for about a year now.

3            THE COURT:  Is that mike on?

4            (Pause to adjust the microphone.)

5            MS. SAN NICOLAS:  All right.

6       Q.   Agent Desamito, what are your working hours?

7       A.   On my time sheet it says nine to five, but

8   it's -- could be nine to nine.

9       Q.   All right.  Agent, I'd like to call your

10  attention to a date, December 29, 2006; were you

11  working on that date?

12      A.   Yes, ma'am.

13      Q.   All right.  Had you worked a full day?

14      A.   Yes, ma'am, a full day.

15      Q.   All right.  Now, on that date, did you receive

16  a call from an anonymous person?

17      A.   Yes, ma'am.

18      Q.   All right.  About what time did you receive

19  this call?

20      A.   6:00 p.m.

21      Q.   What did that person say to you?

22      A.   The caller asked me if -- she's known now --

23  or he's known now, he/she is known now as the SOI.

24      Q.   Okay, so we'll refer to --

25      A.   The source.

1    Q.    -- him or she as source of information?

2    He/she?

3    A.    He/she.

4    THE COURT:  That's national identi -- oh,

5    he/she.

6    THE WITNESS:  That's what's on my affidavit.

7    THE COURT:  All right, for purposes of

8    identification you put him or her, he/she, all right.

9    MS. SAN NICOLAS:  Okay.

10    Q.    Now, were you working that night at your DEA

11    office?

12    A.    Yes, ma'am.

13    Q.    All right.  And where were you when you

14    received this call?

15    A.    I was on my desk.

16    Q.    All right.

17    THE COURT:  I'm sorry, you were where?

18    A.    On my area, my work area.

19    THE COURT:  Okay.

20    MS. SAN NICOLAS:  All right.

21    Q.    So what did the SOI, the source of information

22    say to you?

23    A.    The source indicated to me that there was a

24    DHL package on its way to Guam from Fife, Washington

25    that contained about five ounces of the drug ice.

1    This is Agent Desamito's affidavit you're

2  proffering?

3             MS. SAN NICOLAS:  Yes, Your Honor.

4                 (Pause while defense counsel examines the

5                 document.)

6             THE COURT:  Gina, have it marked as an

7  exhibit.  What do you call it, prosecution exhibit?

8             MS. SAN NICOLAS:  Government's Exhibit 10,

9  Your Honor.

10            THE COURT:  10?

11            MS. SAN NICOLAS:  Yes, Your Honor.

12            (Exhibit 10 was marked for identification.)

13  BY MS. SAN NICOLAS:

14      Q.    Agent Desamito, I've placed in front of you a

15  document which has been labeled Government's Exhibit

16  10; what is this document?

17      A.    It's an affidavit.

18      Q.    Now I asked you a question earlier, can you

19  tell me what was the DHL number that was given to you

20  on December 29, 2006?

21      A.    The DHL number is 8329724874.

22      Q.    All right.  Now as that number was given to

23  you, you testified that you got on the DHL website?

24      A.    Yes, ma'am.

25      Q.    And what was the result of looking on the

```
1    website?

2         A.    The outcome was the number yielded the package

3    left from Fife, Washington on the 15th, and enroute to

4    -- was at Los Angeles on the 27th.

5         Q.    Okay, when you said 15th, what month?

6         A.    I'm sorry, December 15th.

7         Q.    All right.  So the information that you

8    received from the source of information, you confirmed

9    it then?

10        A.    Yes, ma'am.

11        Q.    All right.  Now, after you confirmed that

12   there actually was a package coming to Guam with this

13   specific DHL number, what did you do?

14        A.    I contacted Task Force Officer Pete Ofeciar,

15   who is originally a Customs officer, I informed him

16   about the package, and informed the package to have a

17   lookout.

18        Q.    And what's a lookout?

19        A.    When packages come in from off-island, the

20   lookout is for, to basically hold the package or screen

21   it.

22        Q.    Okay.  Now, did you talk again or speak again

23   with this source of information?

24        A.    Yes, I spoke to the source.

25        Q.    All right.  And approximately what date was
```

1    THE WITNESS: Last name is spelled

2  O-F-E-C-I-A-R.

3    THE COURT: Okay. O-F-E-C-I-A-R, Ofeciar.

4  Thank you.

5  BY MS. SAN NICOLAS:

6    Q. Agent Desamito, all right, you met with the

7  source of information on December 29, 2006?

8    A. Yes, ma'am.

9    Q. What did the source of information tell you on

10  that date?

11    A. The source informed me that the package was

12  meant for a Ryan Wall, and it was to be arriving on

13  Guam.

14    Q. Okay. Did the source of information tell you

15  what the package contained?

16    A. Yes, ma'am, during the conversation the source

17  indicated that the package contained the drug ice.

18    Q. Did the source of information say that he or

19  she knew that this had happened prior?

20    A. Yes, ma'am.

21    Q. Previously? All right. Did the source of

22  information tell you an approximate date?

23    A. The source indicated December 6, 2006.

24    Q. Now, when the SOI was referring to that

25  December 6 package, what was inside that December 6

1    meeting, Your Honor.

2              THE COURT:  Only one.  Okay.

3              MR. ARENS:  That's not correct, Your Honor.

4    I'll show you the discovery, if the court's inclined,

5    to show there were more than one meeting with the

6    source.

7              THE COURT:  Okay.  Well, maybe we can get a

8    date on this face to face meeting and that clarify

9    everything.

10        Q.   (BY MS. SAN NICOLAS:)  Agent, you received a

11   tip, a telephonic tip.  After that you met with -- face

12   to face with the source of information; is that right?

13        A.   Yes, ma'am.

14        Q.   All right.  What information was given to you

15   that would led you -- lead you to believe that there

16   was probable cause to believe that evidence of the

17   crime can be found in that package?

18              In other words, what additional information

19   did you receive?

20        A.   Besides the tracking number, the source

21   indicated that prior to the package that was coming

22   in, another package had arrived on Guam on December 6,

23   2007 (sic), which contained the drug ice.  The source

24   also indicated Ryan Wall as the recipient of that

25   package.

1    that they use?

2         A.    Yes.

3         Q.    One of the techniques, do drug importers use

4    the mail system for importation?

5         A.    Yes, ma'am.

6         Q.    And you informed the magistrate judge of this

7    in your affidavit; is that correct?

8         A.    Yes.

9         Q.    All right.  Based on the information that you

10   had received, the tip on December 29, 2006, the face-

11   to-face meeting with the source of information on

12   December 29th, the fact that the DHL package actually

13   checked out, and based on the fact that --

14             MR. ARENS:  Excuse me, Your Honor, objection.

15   Checked out with regard to what?  Confirmed the

16   presence of contraband?  Checked out the tracking

17   number?

18             MS. SAN NICOLAS:  I'll restate it, Your Honor.

19             THE COURT:  All right, restate.

20             MS. SAN NICOLAS:  All right.

21        Q.    Agent, could you tell the court what gave you

22   probable cause to believe that there would be drugs in

23   that package, what facts?

24        A.    All the statements by the source regarding the

25   method, tracking number, points of origin, points of

```
1   designation.  And the actually the tracking number
2   itself.
3       Q.   Was that garnered from the first telephonic
4   information that you received?
5       A.   Yes, ma'am.
6       Q.   Okay.  Did you also take in consideration the
7   face-to-face meeting?
8       A.   Yes, ma'am.
9       Q.   What about the second, the face-to-face
10  meeting with the source of information, led you to
11  believe that there is probable cause to believe that
12  there is -- that the package may contain proof that
13  there was a crime had occurred?
14      A.   I'm sorry, can you repeat it?
15      Q.   What about the face-to-face meeting, what
16  information did you glean from the face-to-face meeting
17  with the source of information?
18      A.   The identity of the suspect --
19          MR. ARENS:  Excuse me, Your Honor, object.
20  Could the government please describe which meeting
21  she's referring to?
22          MS. SAN NICOLAS:  The face-to-face meeting.
23          THE COURT:  Was there only one meeting,
24  Ms. San Nicolas?
25          MS. SAN NICOLAS:  There was -- there was one
```

1   the court will sustain the objection.  You're asking

2   who received it after him?

3           MR. ARENS:  That's fine.

4           THE COURT:  The court will sustain Ms. San

5   Nicolas's objection.  He's clarified that on paragraph

6   16.

7           Okay, next question.

8           MR. ARENS:  Thank you.

9       Q.  Regarding the December 6, 2006 information you

10  received from the confidential informant, you were

11  impressed with the details she -- or that person had

12  given you, weren't you?

13      A.  Yes, sir.

14      Q.  And as a matter of fact, I believe you said

15  Thursday that it increased the level of probable cause

16  in your mind when you received such detailed

17  information; correct?

18      A.  Yes, sir.

19      Q.  Was there any doubt in your mind as to the

20  truth or falsity of that statement, that is, that a

21  package was received by Mr. Wall on the 6th of

22  December, 2006?

23      A.  No, sir.

24      Q.  Well, you knew Mr. Wall was in jail on the 6th

25  of December, 2006, didn't you?

1    A.    (No response.)

2    Q.    I'll refer to the top of page 6 please, it's

3  paragraph 16.

4    A.    Yes, sir.

5    Q.    And that was a significant fact as far as you

6  were concerned, wasn't it?

7    A.    It could not be corroborated.

8    Q.    Did you think would have been important,

9  Officer Desamito, to either delete it or put in the

10  affidavit, that it couldn't be corroborated?

11    A.    No, sir, I believe I had enough from just the

12  call itself, and from the DHL tracking number and all

13  the confirmations.

14    Q.    But you tried to corroborate it, didn't you?

15    A.    Ah, no, sir, because I didn't know where to

16  start from that.

17    Q.    You just said it wasn't corroborated?

18    A.    Yes, I didn't know how to corroborate that

19  portion, the information that the caller gave me as far

20  as the tracking number.  I could have done -- I went to

21  the website, typed out the tracking number, and what

22  the caller gave me is what was on the website.

23    Q.    You didn't even call DHL and say, did you have

24  a package come in on the 6th of December, 2006

25  addressed to Ryan Wall, did you?

1    A.    No, sir.

2    Q.    Yet, according to you, the probable cause you

3    had was the reliability of this informant, wasn't it?

4    A.    Yes, sir.

5    Q.    The CI eventually told you his/her name,

6    didn't he/she?

7    A.    Yes, the source did.

8    Q.    You didn't run a police check on the source,

9    did you?

10   A.    Yes, we did.

11   Q.    Did you give that to the government?

12   A.    Yes.

13        MR. ARENS:  Your Honor, may we approach

14   please?

15        THE COURT:  Okay.

16             (At side-bar.)

17        MR. ARENS:  Did you give us anything to do

18   with her police check?

19        MS. SAN NICOLAS:  I don't have anything on the

20   name of the CI, or SOI.  I don't have anything on the

21   rap sheet request, I don't have anything like that

22   search my files.

23        MR. ARENS:  Didn't he say he checked it?

24        MS. SAN NICOLAS:  He said he checked the CI,

25   yes, he said he checked the background of the CI, but

1    birth -- date of birth -- I'm sorry -- place of birth

2    and identification number, what happened next?

3        A.    We, uh, we started prepping for the warrant.

4        Q.    Okay.  Now, did -- were other officers

5    involved in this?

6        A.    Yes, ma'am.

7        Q.    Okay.  And so to clarify, you received the

8    tip, and you also met face to face with the source of

9    information?

10       A.    Yes, ma'am.

11       Q.    All right.  And you also -- when the

12   information was verified with DHL, was that something

13   that you performed solely?

14       A.    On the 29th, me and Task Force Officer Perkins

15   left the office about 12:00 a.m., we agreed to come

16   back the following day to continue our investigation.

17             The following day Task Force Officer Perkins

18   made a check of DHL with the tracking number; his check

19   yielded that the DHL package had arrived on Guam.

20       Q.    Okay.  Now, what information had you received

21   regarding a drug dog sniff?

22       A.    While at my office I was preparing for the

23   warrant, Task Force Officer Perkins along with Customs

24   officers proceeded down to the DHL Tiyan to retrieve

25   the package.

1   told -- what you just read to the court?

2      A.    The information is accurate, sir.  Task Force

3   Officer Perkins indicated to me that the drug detector

4   dog sniff was negative.

5      Q.    You said there was one dog?

6      A.    (No response.)

7      Q.    Well, how many were there, one or two?  If he

8   told you one, and this says two, which did you rely on?

9      A.    Sir, he said the drug detector dog sniff, not

10   the drug detector dogs sniff.

11      Q.    On examination you said one.

12      A.    Yes, sir, dog singular.

13      Q.    How many were there, officer?

14      A.    According to Officer Perkins's report, there

15   were two dogs.  When I got the information from Officer

16   Perkins, he indicated to me that the drug detector dog

17   sniff yielded negative results.  I assumed there was

18   one dog because he said dog sniff.

19      Q.    Is there anything else you assumed in this

20   document, officer, that we need to know about?

21      A.    No.

22      Q.    Since you didn't have personal knowledge of

23   this dog sniff, yet you wrote an affidavit describing

24   it?

25      A.    (No response.)

1    Q.   And this information was presented to the
2    magistrate judge through your affidavit?
3    A.   Yes, ma'am.
4    Q.   And you personally appeared before the
5    magistrate?
6    A.   Yes, ma'am.
7    Q.   Agent, you testified -- you stated in the
8    affidavit before the magistrate that the dog sniff was
9    negative.  Did that alter your belief that crime was
10   ongoing?
11   A.   No.
12   Q.   Why is that?
13   A.   The drug sniff was only one measure that we
14   were going to use to gain more, more probable cause.
15   Q.   In the training and experience that you've
16   detailed, do people involved in dealing drugs attempt
17   to conceal it?
18   A.   Yes, ma'am.
19        MS. SAN NICOLAS:  Your Honor, at this time
20   I have no further questions for this witness.
21        THE COURT:  All right.  Mr. Arens,
22   cross-examine.
23        MR. ARENS:  Your Honor, do you think we'll
24   have time to do this before we break, that I can
25   complete this witness?

```
1              THE COURT:  You have a few more then?

2              MR. ARENS:  Just reference paragraph 19 on

3    page 6, Government Exhibit A.

4              THE COURT:  10.

5              MR. ARENS:  10, beg your pardon.

6              THE COURT:  All right, go ahead.

7       Q.    (BY MR. ARENS:)  The x-ray -- this is a quote

8    from you:  The x-ray showed items that were suspicious

9    in nature and common with drug importation.

10             Is that your statement?

11      A.    Yes.

12      Q.    What specifically is suspicious about a

13   hairbrush?

14      A.    This information was given to me from the

15   officers at the scene.  It was from their knowledge

16   and experience.

17      Q.    They didn't tell you that there was a

18   hairbrush in there, did they?

19      A.    No.

20      Q.    They didn't tell you all of the items that

21   were found in there, did they?

22      A.    No.

23      Q.    They didn't tell you there was a battery in

24   there, did they?

25      A.    No.
```

1     Q.   They just said it's suspicious?

2     A.   Suspicious in nature and common with drug

3     importation.

4     Q.   You didn't ask them why it was suspicious in

5     nature and used common with drug importation, yet you

6     filed an affidavit and gave it to the magistrate under

7     oath; is that right?

8     A.   Sir, at that time I trusted the training and

9     experience, the x-ray the Customs officer had.

10    Q.   So when he says it's suspicious, you just, at

11    your typewriter:  Package is suspicious, common with

12    drug trafficking.  Is that right?

13    A.   Yes, sir.  He has more knowledge than me with

14    x-raying packages with suspicious material in it.

15    Q.   All right.  And, officer, is it your practice

16    to make a sworn statement subject to perjury without

17    confirming or following up on the information you put

18    in that affidavit?

19    A.   (No response.)

20    Q.   Is that your practice?

21    A.   No.

22    Q.   In preparing this affidavit, then, you broke

23    what is normally your practice, didn't you?

24    A.   No.

25    Q.   Officer, you didn't follow up and you didn't

```
 1   confirm the contents of your affidavit, did you?
 2       A.    Later on it was --
 3       Q.    Whoa, whoa!  I'm talking about while you were
 4   writing this affidavit.
 5       A.    The only people I could confirm with were the
 6   people that were there.
 7       Q.    And so Perkins, if I understand you correctly,
 8   walked into the office, you're at your typewriter,
 9   because you, according to you, were writing this down
10   at your typewriter as it was coming to you, and he
11   said, gosh, we just x-rayed it and it looks suspicious,
12   and you didn't follow up on what was suspicious about
13   it before you wrote it in your sworn affidavit?
14       A.    Officer Perkins informed me telephonically
15   that there was suspicious items inside the package.
16       Q.    And at that, you wrote the report, without any
17   follow up?
18       A.    Later on when Officer Perkins returned to our
19   office, he showed me the, the X-rays, and he explained
20   to me what the Customs officers deemed suspicious.
21                 (Pause.)
22            MR. ARENS:  Your Honor, I'm about to conclude,
23   Your Honor.
24            THE COURT:  Okay.
25       Q.    (BY MR. ARENS:)  Did you agree with him that
```

1  the specific question was, can you please tell us,

2  read, I think it was under cross-examination -- yeah,

3  can you read paragraph 19 -- was it 19?

4          MS. SAN NICOLAS:  Your Honor, I believe that

5  was under cross-examination by Mr. Arens.

6          THE COURT:  Right.  And he did not read it.

7  So are you all speaking from the same affidavit?  Do

8  you guys have the same one that I have?

9          MS. SAN NICOLAS:  Apparently not, Your Honor.

10         MR. ARENS:  I think it's apparent we don't

11  have the one that was submitted to the judge.

12         THE COURT:  So that's not good.

13         MR. ARENS:  That's not good at all.

14         THE COURT:  That's terrible.  That means that

15  you're not all talking from the same, you know --

16  because in the affidavit that was submitted to the

17  magistrate's judge, it specifically talks about why the

18  object was suspicious in nature.  Now, I didn't bring

19  it up at all because I figured, well, you know, you

20  guys will get through that, through the testimony, I'll

21  let you all get through that.

22         But when Ms. San Nicolas submits to me on

23  March 16 this U. S. memorandum regarding suppression

24  hearing and attached is the affidavit that does not

25  have the most updated affidavit as far as I'm

1   concerned, or as far as I know, without -- it's

2   submitted to me without all of the written amendments

3   in, I realized that she's got the wrong affidavit,

4   you've got the wrong affidavit, you're talking from the

5   wrong affidavit, or a different affidavit from what I

6   have in my court.

7         So, Mr. Arens, do you want to look at that?

8   Do you want to look at that right there?  Look at page

9   6.

10         MR. ARENS:  Could I get a copy of this?

11         THE COURT:  No, it's coming.  It's all coming.

12         MR. ARENS:  I've never seen this.

13         THE COURT:  You've never seen that?  That's

14   not good.

15         MS. SAN NICOLAS:  Your Honor, we would ask the

16   court for permission to -- well, obviously to review

17   the document, but then to elicit the questions, what

18   clarifications were made in chambers for the magistrate

19   judge by Officer Desamito.

20         THE COURT:  Well, I mean, you're looking at

21   specifically on its face the written document.  You all

22   have the wrong written document, do you agree with

23   that, Ms. San Nicolas?

24         MS. SAN NICOLAS:  I agree, Your Honor, that

25   there are interlineations made, something --

1  items were deemed suspicious because there was organic

2  material thought to be in the package?

3      A.    Right after, sir, when Perkins returned to the

4  office and showed me the X-rays.

5      Q.    And you made the determination that it was

6  suspicious based on the presence of organic matter;

7  isn't that correct?

8      A.    No, sir.  I, I made a determination from the

9  information I got from the Customs officers.

10     Q.    What information is that, Officer Desamito?

11     A.    That it was suspicious.

12     Q.    Did you ask them what they meant by

13  suspicious?

14     A.    Suspicious to contraband.

15     Q.    They didn't tell you it had organic material

16  appearances when it went through the x-ray, did they?

17     A.    No, they didn't.

18     Q.    Perkins didn't tell you that, did he?

19     A.    No, he didn't.

20     Q.    And you didn't make that determination by

21  looking at the X-rays yourself, did you?

22     A.    No, sir.

23     Q.    And you didn't type organic material in your

24  affidavit, did you?

25     A.    I would have to see the affidavit again.

1   paragraph 19?

2       A.   "CET determined the contents were organic in

3   nature and through their training and experience

4   consistent with contraband."

5       Q.   Why did you write that under paragraph 19,

6   Officer Desamito?

7       A.   Because Judge Manibusan wanted more

8   clarification as how I got to that.

9       Q.   And you said, "Judge Manibusan, hand me that

10  document and I'll fill in the rest"; is that what you

11  did, Officer Desamito?

12      A.   No, Judge Manibusan requested for me to write

13  in more detail as far as how I -- how I came to that

14  determination.

15      Q.   Well, you never did come to the determination,

16  did you?

17      A.   No, sir.

18      Q.   Would it surprise you that the term "organic

19  material" is not contained in any of the discovery we

20  have found so far?

21           MS. SAN NICOLAS:   Objection, Your Honor.

22           THE COURT:   What's the objection?

23           MS. SAN NICOLAS:   Your Honor, under a totality

24  of the circumstances analysis, the issue isn't what

25  happened subsequent to the issuance of the warrant.

```
 1        A.    Yes, I do.

 2        Q.    As your own?

 3        A.    Yes.

 4        Q.    As the truth?

 5        A.    Yes, it is.

 6        Q.    With regard to the background check of

 7   Mr. Wall, did you take the time to go to the Superior

 8   Court and see the date of arrest, see whether a

 9   judgment was entered, see which portion of the

10   proceedings the case was now at, or then at?

11        A.    No, sir.

12              MR. ARENS:  No further questions, Your Honor.

13              THE COURT:  Okay.  I need to -- you need to

14   clarify something, Agent Desamito.

15              THE WITNESS:  Yes, ma'am.

16              THE COURT:  Paragraph 19, I'm not clear on how

17   you got the information that you wrote in.

18              THE WITNESS:  Which part, ma'am?

19              THE COURT:  The writing under paragraph 19.

20              THE WITNESS:  Oh, the -- the writing just

21   explains the second and third sentence.  TFO Perkins

22   and CO3 Gange took the package to Customs Section at

23   the Guam International Airport and x-rayed the package.

24   The x-ray showed items that were suspicious in nature

25   and common with drug trafficking.
```

```
 1            Judge Manibusan wanted to know how the Customs
 2    officer, okay, determined that the package was
 3    suspicious in nature and common to drug trafficking.
 4            THE COURT:  All right.  And I'm not sure you
 5    clarified that for us earlier.  Who gave you this
 6    information?
 7            THE WITNESS:  That was TFO Perkins.
 8            THE COURT:  Perkins gave this to you?
 9            THE WITNESS:  Yes, ma'am.
10            THE COURT:  Perkins told you that --
11    everything that you wrote here on paragraph 19, Perkins
12    told you that?
13            THE WITNESS:  Yes, ma'am.
14            THE COURT:  Quote:  The CET determined the
15    contents were organic in nature, and through their
16    training and experience, consistent with contraband.
17            THE WITNESS:  Yes, ma'am.
18            THE COURT:  Okay.  When you spoke to -- when
19    did you speak to him?
20            THE WITNESS:  This was right after, we were
21    already at the office.
22            THE COURT:  Right after where?  I'm sorry,
23    give me the timing of this.
24            THE WITNESS:  Right after they were checking
25    the package.  They went to the airport to check the
```

1  package, brought it back to the office.

2         THE COURT:  Okay.  I'm sorry, I recall you

3  saying that Perkins, Agent Perkins showed you the

4  X-rays?

5         THE WITNESS:  Yes.

6         THE COURT:  Was that at the same time?

7         THE WITNESS:  Yes, that's at the same.  That's

8  where the word organic came from.

9         THE COURT:  Okay.  Then tell me what happened.

10        THE WITNESS:  Well, TFO Perkins explained to

11  me what was explained to him by the Customs officers.

12        THE COURT:  Because he was there.

13        THE WITNESS:  Because he was there, that this,

14  that the portion of the x-ray showed an organic matter.

15  I was like, you know, what's that?  He was like, that's

16  what the Customs officers informed him.

17        THE COURT:  Okay.  And so, and he, Agent

18  Perkins told you that, and you placed that on this page

19  6?

20        THE WITNESS:  Yes, for clarification, upon

21  the -- you know, upon when Judge Manibusan questioned

22  me about it.

23        THE COURT:  Judge Manibusan was trying to find

24  out what you meant by suspicious in nature.

25        THE WITNESS:  On what -- he wanted to know

1    THE WITNESS:  Yes, ma'am.

2    THE COURT:  Go ahead.

3    MR. ARENS:  I have a followup based on the

4 court's questions if I may, Your Honor?

5    THE COURT:  You may.

6               FURTHER RECROSS-EXAMINATION

7 BY MR. ARENS:

8    Q.   According to your earlier testimony, while you

9 had direct contact with Agent Perkins, you were at your

10 typewriter typing in what people were saying; isn't

11 that right?

12   A.   Yes, sir.

13   Q.   Well, you didn't write organic matter in the

14 affidavit, did you?

15   A.   The organic matter came after, sir, when Agent

16 Perkins arrived.

17   Q.   And you didn't have time to go in and insert

18 that prior to showing it to the magistrate judge; is

19 that what you're telling the court?

20   A.   Sir, at that time I didn't think it was

21 necessary.

22        THE COURT:  Okay, I'm sorry, do you want to

23 clarify the timing on this?

24        MR. ARENS:  Apparently, Your Honor -- correct

25 me if I'm wrong, Officer Desamito -- typing it down

1      Q.    He said he told you there was an organic

2   product in there, didn't he?

3      A.    Yes, sir, we discussed that.

4      Q.    And that's not in your report either, is it?

5      A.    No, sir, it's not.

6      Q.    It's not in the affidavit of probable cause,

7   is it?

8      A.    As it was signed, yes, it was, sir.

9      Q.    Before it was taken into the office, it wasn't

10  in that report, was it?

11     A.    No, sir, it was not.

12     Q.    These findings about turning the package

13  upside down, he told you what that led him to believe,

14  didn't he?

15     A.    Yes, sir, I was standing right next to him as

16  -- through the whole process.

17     Q.    And that wasn't in your report either, was it?

18     A.    No, sir.

19     Q.    He told you the way it was packaged was

20  suspicious, didn't he?

21     A.    Yes, sir, he did.

22     Q.    And that wasn't in your report?

23     A.    No, sir, it culminated to the suspicious in

24  nature, and that was in my report.

25     Q.    Items suspicious in nature and common in drug

1  again, Ms. San Nicolas?  What's your last question?

2      MS. SAN NICOLAS:  The question, Your Honor,

3  was, what was suspicious about the x-ray.  His response

4  was that it appears to be -- he didn't complete the

5  answer, but it appears he was going to state what was

6  suspicious about it.

7      THE COURT:  Just the x-ray itself, right?

8      MS. SAN NICOLAS:  Well, he also testified that

9  it was also the DEA intel that he had received.

10     THE COURT:  I know, but the question that was

11 focusing on the x-ray right now, is that where you're

12 going?

13     MS. SAN NICOLAS:  Yes.

14     THE COURT:  All right.  The objection will be

15 overruled.  You may answer the question regarding the

16 x-ray.

17     Restate the question?

18  Q.  (MS. SAN NICOLAS:)  Why did you believe there

19 were illegal narcotics in that package?

20  A.  Like I was saying earlier, it was based on my

21 experience with looking at these types of X-rays.

22  Q.  This information that you had after you

23 x-rayed it, did you convey that to the DEA task force

24 agents?

25  A.  To Officer Perkins, yes, consistent with  --

1  saying it was consistent with possible contraband.

2      Q.   At that point, you could have opened the

3  package?

4      A.   Yes, I could have.

5      Q.   As a Customs officer, is that right?

6      A.   Yes, ma'am.

7      Q.   As a Customs -- as a contraband enforcement

8  officer, someone who is on a contraband enforcement

9  team, what are the things you look for that are

10  suspicious based on your training?

11      A.   Well, where it's being sent from, the items

12  itself, the way they package it, these are some of the

13  things that we look at.

14      Q.   Are you familiar with attempts to conceal?

15      A.   Yes.  With some of the classes that they do

16  give us, like on-the-job training also, they actually

17  do try to hide things and ask the officer to pinpoint

18  what it is, what the commodity may be.

19      Q.   So you have a lot of -- you have on-the-job

20  training as well?

21      A.   Yes, I also have on-the-job training.

22      Q.   How often do you have packages that are

23  unmanifested?

24      A.   It's on a daily basis, because some shipments

25  will arrive with certain freight forwarders, some get

1    Q.    That's the first time in your report there's
2    mention of suspected crystal methamphetamine, isn't it?

3    A.    It's actually a field test positive, sir.

4    Q.    That is the first time in your report you
5    mentioned crystal methamphetamine, isn't it?

6    A.    Yes, sir.

7    Q.    No reference to organic material in your
8    report, is there?

9    A.    That was discussed with the case agent for
10   DEA, Mike Perkins.

11   Q.    My question, Officer Gange, is there is no
12   reference --

13   A.    No, sir.

14        THE COURT:  I'm sorry, what was no reference
15   to what?

16        MR. ARENS:  To a crystal-like substance
17   anywhere in his report prior to the execution of the
18   warrant upon the package.  No mention of organic
19   compound in the report.

20   Q.    As a matter of fact, the suspicious nature of
21   the way it was packaged isn't in your report either, is
22   it?

23   A.    No, sir.

24   Q.    As a matter of fact, the list on the outside
25   compared with the items in the inside, which you deem

1    But the actual, the actual x-ray when you look at it,

2    you could actually see what you're looking at.

3             THE COURT:  So this just shows the same

4    similar stuff you indicated earlier.

5             Okay, thank you, officer.

6             Do you have any questions, you guys, while

7    he's here on these exhibits?

8             MR. ARENS:  I just have a couple of followup,

9    but I can wait until you're done, Your Honor.

10            THE COURT:  Okay.  Let me just ask you --

11   looking at my notes here.

12            So what exactly did you tell, just for

13   clarification, what exactly did you tell officer, Agent

14   Gange, regarding your x-ray --

15            THE WITNESS:  Officer Perkins, you mean?

16            THE COURT:  I'm sorry, Perkins.  You're

17   Officer Gange, excuse me, I apologize.

18            THE WITNESS:  That it possibly contained

19   illicit narcotics based on my experience, and also the

20   way it was packaged.

21            THE COURT:  And you could, you could tell when

22   you moved it -- when you X-rayed the package you

23   indicated it appears like everything was glued

24   together?

25            THE WITNESS:  Well, when we turned it upside

1
2
3
4
5

6                          DISTRICT COURT OF GUAM

7                            TERRITORY OF GUAM

8

9    UNITED STATES OF AMERICA,                    Criminal Case No.  07-00001

10                     Plaintiff,

11           vs.                                  **ORDER RE: MOTION TO SUPPRESS
                                                  EVIDENCE AND STATEMENTS**
12   RYAN JASON WALL,

13                    Defendant.

14

15        The Defendant's Motion to Suppress came before this Court for an evidentiary hearing

16   on March 19 and March 20, 2007.  After hearing the testimony of witnesses and argument from

17   counsel, the court **DENIED** the Defendant's motion.  For the reasons discussed herein, the court

18   sets forth more fully the reasons for **DENYING** the motion.

19                                    **I. FACTS**

20        On December 29, 2006, at approximately 6:00 p.m., DEA Task Force Officer Marvin R.

21   Desamito ("Officer Desamito") received an anonymous telephone call regarding a DHL package

22   containing crystal methamphetamine ("ice").  The caller ("informant") provided Officer

23   Desamito with DHL Tracking Number 8329724874 and told the officer that on December 15,

24   2006, the package had been sent from Fife, Washington.  While he was on the phone with the

25   informant, Officer Desamito verified the package number with the DHL Website.  He

26   subsequently placed a "lookout" for the DHL package with Guam Customs and Quarantine

27   Agency.

28        On that same date, Officer Desamito and Officer Michael C. Perkins ("Officers") met

DEFENDANT'S
EXHIBIT
B

1    with the informant in Hagåtña, Guam.  The informant told the Officers that the package had been

2    sent to the Defendant, Ryan Jason Wall ("Defendant").  In addition, the informant told the

3    Officers that the Defendant had previously received a DHL package which had contained "ice"

4    that had been concealed in the package.

5            Thereafter, Officer Desamito conducted a criminal history check of the Defendant and

6    learned that he was currently on probation on Guam for charges of Assault and Family Violence,

7    Failure to Appear, Violation of a Court Order, and Assault.  Additionally, an arrest warrant had

8    been issued for Mr. Wall in Tacoma, Washington.

9            On December 30, 2006, Officer Perkins learned that the DHL package had arrived on

10   Guam at 8:00 a.m.  A cursory sniff of the package was made by Guam Customs and Quarantine

11   Drug Detector Dogs with negative results.  The package was also X-rayed at the Guam

12   International Airport Authority ("GIAA") and the contents were noted to contain an organic

13   substance consistent with illegal contraband.  The package was secured in the Customs

14   Enforcement Team vault at the GIAA.  The Officers then requested for and obtained a search

15   warrant from the magistrate judge on December 31, 2006.

16           On December 31, 2006, the search warrant was executed and the DHL package was

17   opened at the Guam Resident Office.  The DHL package was identified as 8329724874.  *See*

18   Opposition, Exhibit 1 attached thereto.  The contents were field tested with the Marquis Reagent

19   Kit and tested positive for methamphetamine.  *See* Opposition, Exhibits 6 and 7.  The packages

20   contained 118.9 gross grams of crystal methamphetamine.  *See* Opposition, Exhibits 8 and 9.

21           The methamphetamine was replaced with a "sham" product and placed back into the mail

22   delivery system.  The Defendant drove to the DHL Office, entered the building and provided the

23   tracking number and received the package.  As he was leaving the building, he was arrested.

24   The Defendant now seeks the suppression of all the physical evidence and the fruits thereof,

25   along with any other physical evidence and statements, derived from the search of the DHL

26   package executed on December 31, 2006.

27                                    **II. DISCUSSION**

28           Defendant specifically argues that the evidence seized from the Defendant should be

- 2 -

1   suppressed because there was no probable cause supporting the warrant. The Fourth Amendment

2   restrains the government from performing "unreasonable searches and seizures." U.S. CONST.

3   amend. IV. The touchstone in evaluating the permissibility of any search is "reasonableness."

4   *Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). In most cases,

5   reasonableness requires a warrant and probable cause, supported by Oath or affirmation. *Id.* It is

6   unnecessary that the evidence establishing probable cause reflect the direct personal observations

7   of a law enforcement official. *United States v. Ventresca*, 380 U.S. 102, 108 (1965). The evidence

8   may be based upon a confidential informant's tip, so long as the issuing judge is reasonably assured

9   that the confidential informant was credible and the information was reliable. *Id.*

10      Probable cause exists when, under the totality of the circumstances, "there is a fair

11  probability that contraband or evidence of a crime will be found in a particular place." *Illinois v.*

12  *Gates*, 462 U.S. 213, 238 (1983). In reviewing the validity of a search warrant, a court is limited

13  to the information and circumstances contained within the four corners of the underlying affidavit.

14  *United States v. Stanert*, 762 F.2d 775, 778 (9th Cir. 1985). A magistrate judge's issuance of a

15  warrant is reviewed for "clear error," and the warrant should be upheld as long as the magistrate

16  judge had a "substantial basis for concluding that probable cause existed based on the totality of the

17  circumstances." *United States v. Leon*, 468 U.S. 897, 914 (1984); *United States v. Mendonsa*, 989

18  F.2d 366, 368 (9th Cir. 1993). The task for the issuing magistrate or judge is "simply to make a

19  practical, common sense decision whether, given all the circumstances set forth in the affidavit

20  before him, there is a fair probability that contraband or evidence of a crime will be found in a

21  particular place." *Gates,* 462 U.S. at 238.

22      This reviewing court is charged with making sure that the magistrate judge had a

23  "substantial basis for" concluding that probable cause existed. *Gates*, 462 U.S. at 244-45. Looking

24  at the affidavit and totality of the circumstances, the court finds there were enough facts contained

25  in the affidavit that supported the magistrate judge's finding of probable cause for the warrant.[1]

26  _____

27  [1]There were other facts presented in the affidavit that at the hearing were shown to be
    superfluous. For example, the affidavit stated that the package was routed from Fife, Washington
28  on a circuitous route headed to Guam. At the hearing, however, testimony was presented that what

- 3 -

1   Officer Desamito received an anonymous tip that drugs would be sent to Guam. The tip included

2   where the drugs were coming from, where they were to be sent, as well as a DHL tracking number.

3   The Officers actually met the informant who provided the name of the Defendant as the intended

4   recipient of the package. The Officers learned that the DHL package matching the DHL tracking

5   number given by the informant had arrived on Guam. A background check of the Defendant

6   revealed that he had an outstanding warrant in Washington and was on probation for local charges.

7   An X-Ray of the package revealed that the package contained an organic substance consistent with

8   the importation of drugs or controlled substance.[2]

9       Additionally, the informant in this case made himself[3] known to the Officers, and the

10  Officers met the informant in person. An in person encounter significantly bolsters reliability

11  because officers "may perceive and evaluate personally an informant's mannerisms, expressions,

12  and tone of voice" and because the informant knows that he may be tracked down and held

13  accountable for false assertions. *United States v. Romain*, 393 F.3d 63 (1st Cir. 2004).

14          Courts look to several factors to determine the reliability of an informant's tip. First,
            a known informant's tip is thought to be more reliable than an anonymous

15          informant's tip. That is because an anonymous informant typically cannot be
            questioned about the basis for knowing the information or motive for providing the

16          tip, nor can the anonymous informant be held accountable for providing false
            information in violation of the law. Second, an informant with a proven track record

17          of reliability is considered more reliable than an unproven informant. Third, the
            informant's tip is considered more reliable if the informant reveals the basis of

18          knowledge of the tip--how the informant came to know the information. Finally, a
            tip that provides detailed predictive information about future events that is

19          corroborated by police observation may be considered reliable, even if the tip comes
            from an anonymous source. Predictive information that reveals a detailed knowledge

20

21  route the package would be mailed were events beyond the Defendant's control. In other words,

22  there was nothing suspicious about this event. In addition, there was a statement in the affidavit that
    the informant had told the Officers that the Defendant had received a prior package of "ice." Again,

23  this fact was not corroborated. However, even disregarding these statements, there was still enough
    stated in the affidavit to establish probable cause.

24

25  [2]On page 6 of the affidavit Officer Desamito added a written notation that "[t]he CET
    determined the contents were organic in nature and through their training and experience consistent

26  with contraband." This notation was added after the Magistrate Judge questioned the Officer
    regarding what was suspicious about the package.

27

28  [3]The gender of the informant was never revealed, however, for purposes of this order the
    informant will be referred to in the masculine pronoun.

-4-

     of an individual's intimate affairs is more reliable than predictive information that could be observed by the general public, and such self-verifying detail is considerably more valuable if it relates to suspicious activities than if it relates to innocent activities.

*United States v. Rowland*, 464 F.3d 899, 907-908 (9th Cir. 2006) (citations omitted).

     The informant in this case gave a description of the Defendant, predicted that the Defendant would receive a package shipped by DHL, accurately stated that the package was coming from Fife, Washington, and provided the correct DHL routing number. The Officers were able to corroborate the informant's tip by contacting the DHL Office to verify that a package with the DHL routing number existed and was on its way to Guam. The informant provided sufficient detail to dispel concerns that the tip was a hoax.

     Although the drug detector dog failed to alert to the drugs in the package, masking the odor of drugs is a common technique used by drug couriers. *See United States v. Brown*, 33 F.3d 1014 (8th Cir. 1994) (United Parcel Service employee searched teddy bear for illegal drugs because it was wrapped in fabric softner sheets); *U.S. v. Urrea-Leal,* 322 F.Supp.2d 1213, 1215 (D.Kan., 2004) (Trooper Morris has been involved in more than 50 interdiction stops in which drugs were seized; 30 to 35 of these were marijuana seizures. Training and experience has taught him that transporters of drugs often attempt to mask or cover up the odor of drugs with other odors); *United States v. Koenig*, 856 F.2d 843, 845 (7th Cir. 1988) (Federal Express employee investigated package smelling of laundry soap or fabric softner because of his knowledge of the use of these products to mask the smell of cocaine).

     The court finds the combination of the verified information provided by the informant and the Controlled Enforcement Team's belief that the package contained a substance organic in nature that was believed to be consistent with contraband provided a substantial basis for the magistrate judge to issue the warrant. Under the totality of the circumstances, the magistrate judge made a sensible decision that a reasonable probability existed that contraband would be found within the DHL package. The magistrate judge's issuance of the warrant in this instance, was not "clear error." *United States v. Leon*, 468 U.S. 897, 914 (1984). "In the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were

- 5 -

1  dishonest or reckless in preparing their affidavit or could not have harbored an objectively

2  reasonable belief in the existence of probable cause." *Leon*, 468 U.S. at 926. In this case there is no

3  basis for such a determination.

4                                     **III. CONCLUSION**

5          Based upon the foregoing, the court finds there was a substantial basis for the magistrate

6  judge to issue the search warrant.[4] Accordingly, the Court **DENIES** the Defendant's motion.[5]

7          **IT IS SO ORDERED.**

8

9                                                  **/s/ Frances M. Tydingco-Gatewood**

10                                                         **Chief Judge**

11                                                    **Dated: Mar 23, 2007**

12

13

14

15

16  ─────────────────────

17          [4]The thorough scrutiny of Officer Desamito's affidavit in this case serves as a reminder to
    law enforcement officers who draft affidavits in their efforts to secure search warrants that they must
18  strive to write clear and concise affidavits that provide sufficient information for a reviewing
    magistrate judge to determine if probable cause exists to justify a search. In many cases, as in this
19  one, the affidavit will be a key piece of evidence in evaluating the issuing judge's probable cause
    determination. Taking the time to carefully draft an affidavit that fully sets out the basis for
20  "probable cause" can often spare courts and parties the necessity of conducting mini-trials on the
    issue of "probable cause."
21          In this instance, the affidavit clearly could have been bolstered by including facts known by
22  Officer Joseph Gange. For example, that based on his years of training and experience the contents
    of the package were packed in a manner consistent with drug packaging; the X-ray of the contents
23  revealed organic material as organic matters will show up white in color in the X-ray. And, that
    when tipping the package, there appeared to be crystalline substances contained therein consistent
24  with methamphetamine. The saving of a warrant should not rest upon the written notation of an
    officer who at the request of the magistrate judge is having to provide further explanation in support
25  of the warrant.

26          [5]Although the Defendant's motion sought the suppression of all the physical evidence and
27  the fruits thereof, along with any other physical evidence and statements, derived from the search
    of the DHL package executed on December 31, 2006, there was no evidence presented concerning
28  any other physical evidence other than the DHL package or evidence of any statements made.

                                              - 6 -

# FILED

MAY 06 2008

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT



RECEIVED

MAY 1 2 2008

FEDERAL
PUBLIC DEFENDER

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 07-10352 |
| Plaintiff - Appellee, | D.C. No. CR-07-00025-FMT |
| v. | |
| RYAN JASON WALL, | MEMORANDUM* |
| Defendant - Appellant. | |

Appeal from the United States District Court
for the District of Guam
Francis Tydingco-Gatewood, District Judge, Presiding

Argued and Submitted April 15, 2008
San Francisco, California

Before: FERGUSON, TROTT, and THOMAS, Circuit Judges.

Ryan Jason Wall appeals the district court's denial of his motion to suppress.

Wall moved to suppress methamphetamine found in a DHL parcel which had been

intercepted by the Guam Drug Enforcement Agency, on the ground that the

affidavit supporting the application for the search warrant was not supported by

---

\* This disposition is not appropriate for publication and is not precedent
except as provided by 9th Cir. R. 36-3.



probable cause. The district court denied the motion, and Wall entered a conditional plea of guilty to conspiracy to distribute methamphetamine and attempted possession of methamphetamine with intent to distribute.

We hold that the information in the affidavit is insufficient to support a finding of probable cause and thus reverse. However, we remand for the district court's consideration in the first instance of whether the seizure was authorized under 5 Guam Code Ann. § 73102(2) or under the good faith exception to the warrant requirement. Because the parties are familiar with the factual and procedural history of this case, we will not recount it here.

I

Probable cause exists when "given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238-39 (1983). We review the issuance of a search warrant by a magistrate judge for clear error, to determine whether the magistrate had a "substantial basis for concluding that probable cause existed." Id. at 239 (internal quotation marks and alteration omitted). Like the district court, we are "limited to the information and circumstances contained within the four corners of the underlying affidavit."

2

United States v. Stanert, 762 F.2d 775, 778 (9th Cir. 1985), amended on other grounds, 769 F.2d 1410 (9th Cir. 1985). The affidavit supporting the warrant application contained two sources of information to establish probable cause: a confidential informant, and conclusions drawn by customs officers after x-raying the package. Under the circumstances, this information is insufficient to sustain a finding of probable cause.

## A

To determine whether an informant's tip is sufficient to support a finding of probable cause, a court must use a "totality-of-the-circumstances approach" that takes into consideration the informant's "veracity" or "reliability" and his "basis of knowledge." Gates, 462 U.S. at 238. We have identified several factors to which a court should look to determine the reliability of an informant's tip. See United States v. Rowland, 464 F.3d 899, 907-08 (9th Cir. 2006). These factors include: whether the informant is known or anonymous, whether the informant has a proven track record of reliability, the informant's basis of knowledge, and whether the informant "provides detailed predictive information about future events that is corroborated by police observation." Id.

Weighing all of the factors, under a totality of the circumstances analysis, we conclude that the confidential informant's tip should have been given little

3

weight.  Although the confidential informant met in person with a Drug

Enforcement Agency (DEA) agent, the informant had no track record of reliability,

did not reveal her/his[1] basis of knowledge, and did not provide any predictive

information about future events.  DEA agents verified only "innocent"

information, which was just as consistent with legal activity as it was with the

illegal activity the informant alleged.  "[M]ere confirmation of innocent static

details is insufficient to support an anonymous tip."  United States v. Mendonsa,

989 F.2d 366, 369 (9th Cir. 1993).

B

The only additional information in the affidavit that could support a finding

of probable cause is the handwritten notation that agents "determined the contents

were organic in nature and through their training and experience consistant [sic]

with contraband."  The affidavit does not explain the meaning of the term "organic

in nature," nor does it offer any explanation as to what made the contents

consistent with contraband.  Indeed, the tip indicated that the package would

contain methamphetamine, a synthetic compound–not an organic product.

Therefore, the fact that the package contained organic product detracted, rather

than added, to the indicia of contraband.

---

[1] The gender of the confidential informant was never revealed.

4

Such unsubstantiated conclusions are insufficient to establish probable cause. See, e.g., United States v. Clark, 31 F.3d 831, 834-35 (9th Cir. 1994) (finding no probable cause based on an anonymous tip that Clark was growing marijuana, coupled with a detailed account of Clark's monthly electrical consumption and the conclusory statements that the electricity use was unusually high and that marijuana cultivators often consume excessive quantities of electricity to provide light and heat to the plants).

Because an uncorroborated tip, coupled with an unsupported conclusion that the contents of a package are "consistent with contraband," does not establish "a fair probability that contraband or evidence of a crime will be found in a particular place," Gates, 462 U.S. at 239, the supporting affidavit did not provide a "substantial basis for concluding that probable cause existed," id., and the magistrate judge erred in issuing the search warrant.

## II

The government argues that the seizure was valid because Guam Customs Officers were statutorily authorized, under 5 Guam Code Ann. § 73102(2) ("the Guam Statute"), to seize the contents of the DHL package. We recently held, in Rowland, that "Guam Customs officers are statutorily authorized [under the Guam Statute] to arrest persons and seize methamphetamine 'imported into Guam,'" 464

5

F.3d at 904, and that contraband brought into Guam from another part of the United States is "imported into Guam" for the purposes of the Guam Statute, id. at 907. In denying Wall's motion to suppress, the district court did not address the Guam Statute because it based its decision on other grounds. Both parties presented arguments to us as to the application of the Guam Statute under the circumstances presented by this case. However, the record is not sufficiently developed for us to make that determination as a matter of law, and we would prefer to review that issue on the basis of a fully developed record, coupled with the district court's analysis of the issue.

### III

The district court appeared to conclude that the seizure was justified under the good faith exception to the warrant requirement described in United States v. Leon, 468 U.S. 897 (1984). The government did not raise this defense either before the district court or before us,[2] and the district court order does not appear to

---

[2] The government did cite Leon to the district court, but only in the context of making an anticipatory argument that a Franks hearing on the question of whether the warrant was procured by intentional or reckless misrepresentations was not required. See Franks v. Delaware, 438 U.S. 154, 155-56 (1978). However, Wall did not request a Franks hearing.

6

contain specific factual findings that would underlie the conclusion that the <u>Leon</u> good faith exception would apply.[3]

At oral argument, both parties indicated that if the <u>Leon</u> good faith exception were at issue, they would prefer to develop the factual record and present arguments to the district court in the first instance. Therefore, we conclude that a remand is required to allow the parties to present evidence and arguments on this question, and to allow the district court to make findings and conclusions based on a fully-developed record.

IV

For these reasons, we vacate the order of the district court and remand the case to the district court for its consideration in the first instance based on a full record of the applicability of the Guam Statute and the <u>Leon</u> good faith exception to the warrant requirement.

**VACATED and REMANDED.**

---

[3] Given the district court's conclusion, however, we do not consider the issue waived by the government.